ENTERED
CLERK, U.S. DISTRICT COURT

OCT 1 9 1999

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

FILED
CLERK, U.S. ...

OCT - 8 1999

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DARRYL POLK, )
                         )
        Petitioner, )  Case No. CV 97-8304-RAP(VAP)
                         )
   v. )  ORDER ADOPTING FINDINGS,
                         )  CONCLUSIONS AND RECOMMENDATIONS
GARY LINDSEY, WARDEN, et al., )  OF UNITED STATES MAGISTRATE JUDGE
                         )
        Respondents. )
                         )

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, all of the records herein and the attached Amended and Final Report and Recommendation of United States Magistrate Judge. The Court approves and adopts the Magistrate Judge's Amended and Final Report and Recommendation.

IT IS ORDERED that Judgment be entered denying the Petition with prejudice.

///

///

///    Docketed
        Mld copy Ptys
///    Mld Notice Ptys
     JS-6

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

OCT 1 9 1999

49

IT IS FURTHER ORDERED that the Clerk serve copies of this Order, the Magistrate Judge's Amended and Final Report and Recommendation and the Judgment herein by United States mail on counsel for Petitioner and Respondents.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: _Oct 7_____, 1999


                                    RICHARD A. PAEZ
                                 /  ‾‾‾‾RICHARD A. PAEZ‾‾‾‾‾‾‾‾
                                    UNITED STATES DISTRICT JUDGE

FILED
CLERK, U.S. DISTRICT COURT

FEB 2 5 1999

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL POLK,       )<br>                  )<br>      Petitioner,   )<br>                  )<br>      v.            )<br>                  )<br>GARY LINDSEY, WARDEN, et al.,   )<br>                  )<br>      Respondents.   )<br>                  ) | Case No. CV 97-8304-RAP(VAP)<br><br>AMENDED AND FINAL<br>REPORT AND RECOMMENDATION OF<br>UNITED STATES MAGISTRATE JUDGE |

This Amended and Final Report and Recommendation[1] is submitted to the Honorable Richard A. Paez, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

///

///

///

///

---

[1] Due to the nature of some of the arguments in Petitioner's Objections to the original Report and Recommendation, the Court finds it necessary to amend the original Report and Recommendation to address the Objections. The amendments are appended as footnotes to the original Report and Recommendation. See infra footnotes 3, 5, 6, 8, 9, 10, 13, 14, 15 & 17.

I.    SUMMARY OF PROCEEDINGS

Petitioner, a state prisoner, filed the instant Petition for Writ of Habeas Corpus on November 12, 1997.  Respondents filed a Return on April 30, 1998.  Petitioner filed a Traverse on July 14, 1998.  For the following reasons, the Magistrate Judge recommends the Petition be denied with prejudice.

II.    BACKGROUND

The Crime Scene

On February 12, 1991, Tanee Yemsvat and his wife, Kemika Seaeow, ate dinner at a restaurant with two friends.  [Reporter's Transcript ("R.T.") 2987-88.]  They left the restaurant at approximately 11:15 p.m.  [R.T. 2989.]  At 3:03 a.m. on the morning of February 13, 1991, the police discovered the bodies of Mr. Yemsvat and Mrs. Seaeow inside Mr. Yemsvat's Ford Mustang in a parking garage adjacent to their apartment building in the Hollywood/Los Feliz area of Los Angeles. [R.T. 2627-28, 2638, 2694, 3147.]

Mr. Yemsvat and Mrs. Seaeow were lying face down in the hatchback area of the vehicle, and had sustained gunshot wounds to the head. [R.T. 2630.]  Mr. Yemsvat was hog-tied and Mrs. Seaeow's hands were tied behind her back.  [R.T. 2630.]  Mr. Yemsvat's head was partially covered by a denim jacket.  [R.T. 2631, 2661-62.]  Inside one of the pockets of the black leather jacket worn by Mr. Yemsvat was a package

of gum. [R.T. 2665, 2673-74.] Mr. Yemsvat and Mrs. Seaeow were not wearing shoes. [R.T. 2630, 2660.]

The police found a gold chain underneath the Mustang. [R.T. 2633, 2635-36.] Near the Mustang, the police found two open packages of gum, a restaurant receipt and a pair of black earrings. [R.T. 2636.]

Mr. Yemsvat and Mrs. Seaeow's apartment had been ransacked. [R.T. 2668.] On a desk was a package of gum, which was the same brand as the gum found in the parking garage and in the leather jacket worn by Mr. Yemsvat. [R.T. 2672-74.]

The coroner testified that Mr. Yemsvat had three gunshot wounds in the head and three gunshot wounds in the back. [R.T. 2709, 2715.] Mrs. Seaeow sustained two gunshot wounds to her head. [R.T. 2724.]

Phina Mendoza's Testimony

Phina Mendoza testified that Tony Leater was her boyfriend. [R.T. 2844-45.] Petitioner was Mr. Leater's best friend. [R.T. 2846.] On February 12, 1991, the evening of the murders, Petitioner called Ms. Mendoza's home and asked to speak to Mr. Leater. [R.T. 2847-48.] Upon learning that Mr. Leater was not home, Petitioner asked Ms. Mendoza to page Mr. Leater with Petitioner's telephone number followed by "911." [R.T. 2848.] Ms. Mendoza did as Petitioner instructed. [R.T. 2848.]

Ms. Mendoza went to bed but was awakened between 2:00 and 2:30 a.m. by Mr. Leater. [R.T. 2848-49.] Mr. Leater was dressed in black, and had a pair of gloves and a beanie protruding from his pockets. [R.T. 2852.] Mr. Leater took out a box of bullets and loaded a gun. [R.T. 2849.] Then he threw two beepers, a Gucci watch, a Buddha medallion and $1300 in cash on the bed. [R.T. 2849-50.]

Later that morning, Ms. Mendoza saw a duffle bag containing shoes with shoe trees inside them in Mr. Leater's car. [R.T. 2852-54.] That evening or the next day, Ms. Mendoza also observed Mr. Leater with a Fujitsu cellular phone. [R.T. 2859-60.] Mr. Leater began using the cellular phone every day. [R.T. 2860.]

Approximately two days after Mr. Leater came home with the shoes, telephone and other items, Petitioner called Ms. Mendoza's house. [R.T. 2862.] Petitioner asked Ms. Mendoza to page Mr. Leater and request that he call Petitioner, "but not on that phone." [R.T. 2862-63.] Petitioner did not explain this statement, but Ms. Mendoza believed Petitioner was referring to the Fujitsu cellular phone. [R.T. 2863.] Petitioner also discussed money and told Ms. Mendoza he was going to use "that money" as a deposit for an apartment. [R.T. 2863-64.]

On direct examination, Ms. Mendoza identified the denim jacket that covered Mr. Yemsvat's head as a jacket belonging to Petitioner. [R.T. 2865-66.] On cross-examination, Petitioner's attorney noted the jacket had a "Gap" logo on it and Ms. Mendoza stated she could not

4

remember whether Petitioner's jacket had such a logo. [R.T. 2873-75.] She then stated she was not positive whether the denim jacket was the same one she had seen Petitioner wearing. [R.T. 2876-77.] On redirect, Ms. Mendoza stated the jacket appeared to be almost the same style as the jacket she had seen Petitioner wearing, but that Petitioner's jacket did not have a brown collar like the collar on the jacket admitted into evidence. [R.T. 2880-81.] Ms. Mendoza affirmed that she nonetheless believed the exhibit was Petitioner's jacket. [R.T. 2881.]

During the trial, the prosecutor asked Petitioner to try the jacket on for the jury. [R.T. 3170.] Although there is no contemporaneous statement in the record concerning the jacket's fit, in closing argument the prosecutor stated the jacket fit "perfectly." [R.T. 3401.]

Physical Evidence Linking Mr. Leater to the Crimes

The police searched Mr. Leater's apartment and seized several pairs of shoes from his closet. [R.T. 3038.] A Nordstrom employee, using different store records, identified one of the pairs of shoes found in Mr. Leater's closet as a pair of shoes purchased by Mr. Yemsvat. [R.T. 2836.]

A witness identified the gold chain found underneath the Ford Mustang and the Buddha medallion that Mr. Leater threw on Ms. Mendoza's bed as the chain and medallion that Mr. Yemsvat always wore.

[R.T. 2785-86, 2851, 2940.]  A second witness identified the Gucci watch that Mr. Leater threw on Ms. Mendoza's bed as Mrs. Seaeow's watch.  [R.T. 2919.]  The second witness also stated the pager obtained by Mr. Leater was similar in appearance to a pager carried by Mrs. Seaeow.  [R.T. 2919, 2926.]

The Cellular Telephone

One of Mr. Yemsvat's friends testified that he purchased a Fujitsu cellular telephone for Mr. Yemsvat.  [R.T. 3003-06.]  The cellular telephone never was recovered by the police.  [R.T. 3168.]  A detective, however, testified that the telephone records for Mr. Yemsvat's cellular telephone included dozens of calls placed to Mr. Leater's friends.  [R.T. 3005, 3168-69.]  The telephone records also included a telephone call placed to the residence of Edna Tavares at 2:00 a.m. on February 13, 1991, the morning of the murders.  [R.T. 3119, 3168-69.]

Ms. Tavares testified that she met Mr. Leater a few months prior to the murders, and that Mr. Leater introduced her to Petitioner. [R.T. 3121-22.]  She testified that both Mr. Leater and Petitioner called her on the telephone.  [R.T. 3123, 3125, 3130-31.]  Ms. Tavares could not remember whether Petitioner called her prior to his arrest, but she did remember that he called her after his arrest.  [R.T. 3133-35.]  A detective testified that during the investigation, Ms. Tavares told him that Petitioner started calling her in February 1991.  [R.T. ///

6

3159.]  Ms. Tavares also told the detective that Petitioner and Mr. Leater would call her at all hours of the day and night.  [R.T. 3159.]

The Dog Hair

Petitioner was arrested on February 24, 1991, shortly after the murders.  [R.T. 2772-74.]  At the time of his arrest, Petitioner was driving a Ford Taurus station wagon.  [R.T. 2773-74.]  Petitioner's dog, a bull terrier, was inside the car.  [R.T. 2774.]  The police also found binoculars and gloves in the glove compartment of Petitioner's car.  [R.T. 2933-34.]

A criminalist removed hair samples from Petitioner's dog.  [R.T. 2777-79.]  The criminalist described the dog as white with a brown patch over one eye.  [R.T. 2778-79.]  A second criminalist removed approximately seven white hairs from Mr. Yemsvat's Ford Mustang.  [R.T. 2794-95.]  He was able to positively identify five of the hairs as dog hairs.  [R.T. 2795.]  The second criminalist compared the bull terrier's hairs to the hairs removed from the Mustang and to nine white dog hairs removed from Petitioner's Taurus.  [R.T. 2793-96.]  The second criminalist examined the roots, tips, scale patterns and central air shafts of the hairs.  [R.T. 2797.]  Based on his examination, the second criminalist determined the dog hairs removed from Petitioner's dog and from the two vehicles were "similar in appearance."  [R.T. 2797-98.]

///

///

Several witnesses testified that Mrs. Seaeow and Mr. Yemsvat did not own a dog. [R.T. 2921, 3006, 3015-16.] Ms. Mendoza testified that Mr. Leater did not own a dog. [R.T. 3147.] The evidence also showed that no dog hairs were found on the denim jacket covering Mr. Yemsvat's head. [R.T. 3102.]

The Tape Recording

Detective Aaron Martin testified that upon their arrest, Petitioner and Mr. Leater were placed together in a police car awaiting transportation to police headquarters. [R.T. 3041-42.] The detective placed a micro cassette recorder under some items on the front seat of the car. [R.T. 3042.] Detective Martin obtained a twenty minute recording of a conversation between Petitioner and Mr. Leater in the police car. [R.T. 3045, 3053.] Detective Martin listened to the tape recording over one hundred times. [R.T. 3046.]

Detective Martin explained that the police car had been parked in a parking structure. [R.T. 3042.] It was difficult to hear the words spoken by Petitioner and Mr. Leater due to the noise of the cars in the parking structure. [R.T. 3046.] After his initial review of the recording, Detective Martin played the tape on a larger machine with bigger speakers and a foot pedal that permitted him to replay the last three seconds of tape five times in a row. [R.T. 3047, 3103.] He then took the tape to a police training facility, where additional equipment was used to extract some of the background noise, creating an enhanced tape. [R.T. 3047, 3064-65, 3103-04.] Finally, he went to

8

a private firm and listened to the tape on "theater" speakers with the use of computer enhancement. [R.T. 3047, 3104.] A second enhanced tape was created at that time. [R.T. 3065, 3071.]

Detective Martin testified that he was able to hear some things on the original, unenhanced tape, although he could not recall exactly what he heard on it. [R.T. 3115.] During the enhancement process, he used controls to block out background noise and bring out certain words in the conversation. [R.T. 3104, 3113.] Some words were lost during this process. [R.T. 3104, 3109-10, 3113-14, 3115-16.] Overall, the enhancement process brought out "large portions" of the conversation that previously had been unintelligible. [R.T. 3109-10.]

Detective Martin compiled a transcript of the contents of the tape, identifying as much as possible, and noting indistinguishable words with asterisks. [R.T. 3047-48.] After working extensively on the transcript, Detective Martin reviewed the tape with the assistance of William Duncan, a senior investigator with the district attorney's office. [R.T. 3048, 3289-90.] To produce the final transcript, the two listened to the tape together, and wrote down only the words and phrases that they both agreed were on the tape. [R.T. 3291-92.] Mr. Duncan estimated that approximately thirty to forty percent of the tape was unintelligible. [R.T. 3305.]

The final enhanced version of the tape was introduced into evidence and played for the jury. [R.T. 3048-49, 3052-53.] The prosecutor provided the jury with the final transcript prepared by

9

Detective Martin to use as a guide while listening to the tape. [R.T. 3048-49.] The defense introduced Detective Martin's initial transcription of the tape recording, prepared for the preliminary hearing after the tape was enhanced once at the police training facility (defense exhibit B). [R.T. 3093-96, 3101, 3106-07.] The defense also introduced a third, interim transcript, prepared by Detective Martin after the preliminary hearing and after the tape had been enhanced a second time by the private firm (defense exhibit A). [R.T. 3093-96, 3101, 3110-11.]

Teri Oldknow, a paralegal working for Petitioner's attorney, also prepared a transcript of the tape recording. [R.T. 3245-46.] This transcript also was admitted into evidence (defense exhibit C). [R.T. 3285.] Ms. Oldknow testified that she listened to the tape on different types of equipment and at different speeds. [R.T. 3246-47.] She explained that it was difficult to discern the words and speakers in many portions of the tape. [R.T. 3248-51.] She also estimated that approximately thirty percent of the tape was unintelligible. [R.T. 3255.][2]

///

///

---

[2] Detective Martin's final transcript is attached to Petitioner's federal habeas petition as exhibit A. Detective Martin's initial transcript prepared prior to the preliminary hearing is attached to the federal habeas petition as exhibit B. Detective Martin's interim transcript prepared after the preliminary hearing and prior to the trial is attached to the federal habeas petition as exhibit C. The transcript prepared by Ms. Oldknow is attached to the federal habeas petition as exhibit E.

Defense Testimony

Petitioner's mother and sister testified that they had a party for Petitioner's birthday on February 13, 1991.  [R.T. 3191, 3209.] Petitioner's sister remembered that Petitioner spent the night of February 12, 1991, at home because the family was busy preparing for the party.  [R.T. 3192-95.]  Petitioner's mother remembered getting up at 2:00 a.m. on February 13, 1991, to call her niece to wake the niece up for work.  [R.T. 3210-12.]  When she got up at 2:00 a.m., Petitioner's mother saw Petitioner sleeping on the couch in the living room.  [R.T. 3210-12.]  The niece confirmed that Petitioner's mother called her to wake her up in the early morning hours of February 13, 1991.  [R.T. 3279.]  Petitioner's mother and sister also stated that they never saw Petitioner wear a blue denim jacket like the one found over Mr. Yemsvat's head.  [R.T. 3191, 3213-14.][3]

The Verdict

Petitioner was convicted of two counts of first degree murder, two counts of robbery and one count of burglary.  [R.T. 3473-77.]  The jury found the multiple murder and felony murder special circumstance allegations to be true.  [R.T. 3478-81.]  The jury also found that

_____

[3]  In the Objections, Petitioner states that he presented a "credible alibi for the time the crimes were committed." [Objections at 16.]  The record shows that Petitioner's mother, the key defense witness, was impeached repeatedly concerning her recollection of the events of the night and morning of the murders.  On the whole, Petitioner's mother's testimony was not credible.

11

Petitioner had three prior felony convictions within the meaning of California Penal Code sections 667(a) and 1203(e)(4). [R.T. 3524-26.] The jury deadlocked during the penalty phase. [Clerk's Transcript "C.T." 663.] The trial court sentenced Petitioner to two consecutive terms of life without the possibility of parole plus nine consecutive years in state prison. [C.T. 679.] The California Court of Appeal affirmed the judgment on July 23, 1996. People v. Polk, 47 Cal. App. 4th 944 (1996); [Return, ex D.][4] The California Supreme Court denied Petitioner's petition for review on November 13, 1996. [Return, ex. G.]

### III.    PETITIONER'S CONTENTIONS

Petitioner challenges his conviction and alleges the following grounds for habeas relief:

1. Petitioner's due process right to a fair trial was violated by the introduction of Detective Martin's final transcript of the tape recording, which constituted "false evidence." [Petition at 6; Memorandum in Support of Petition at 9-22.]

2. Petitioner's trial attorney rendered ineffective assistance of counsel because he failed to retain an expert to examine Petitioner's tape recorded conversation and produce a reliable

___

[4] The Court of Appeal's opinion was certified for partial publication. The full opinion is attached as exhibit D to the Return.

transcript.   [Petition at 6; Memorandum in Support of Petition at 23-31.]

3.   Petitioner's due process right to a fair trial was violated by the introduction of the tape recording and Detective Martin's final transcript because the recording was unintelligible.   [Petition at 7; Memorandum in Support of Petition at 32-35.]

4.   Petitioner's trial attorney rendered ineffective assistance of counsel because he failed to obtain the original tape recording of Petitioner's conversation and retain an expert to examine it. [Petition at 7; Memorandum in Support of Petition at 36-41.]

5.   Petitioner's trial attorney rendered ineffective assistance of counsel because he failed to introduce evidence linking Phina Mendoza to the crimes.   [Petition at 7; Memorandum in Support of Petition at 42-47.]

## IV.   DISCUSSION

### A.   STANDARD OF REVIEW

The Petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA").   Pub. L. No. 104-132, 110 Stat. 1214 (1996).   Therefore, the Court applies the AEDPA in reviewing the Petition. See Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059, 2068 (1997); Woratzeck v. Stewart, 118 F.3d 648, 650 (9th Cir. 1997).

13

The AEDPA provides that a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d) (1997).

Under the AEDPA, the Court continues to examine state court conclusions of federal law de novo.[5] Jeffries v. Wood, 114 F.3d 1484,

_____

[5] Following the issuance of the original Report and Recommendation, the Ninth Circuit issued an opinion elucidating the appropriate methodology for applying amended § 2254(d). Davis v. Kramer, No. 98-16122, — F.3d —, 1999 WL 27487 at *6 (9th Cir. Jan. 26, 1999). Davis teaches that a state court decision is "contrary to" clearly established federal law when "a Supreme Court decision clearly establishes a rule that is dispositive of the petitioner's claim, in a factual context that is indistinguishable from - albeit not necessarily identical to - that presented by petitioner's case." Id. "Such cases generally do not call for extensive factual or legal interpretation, but involve the fairly straightforward invocation of a precedent." Id. When no Supreme Court precedent is dispositive of the petitioner's claim, then the state court determination of the claim is reviewed for "reasonableness." Id. "[A] state court decision amounts to an unreasonable application of clearly established federal law where the state court fails to apply a legal principle, enunciated in one or more Supreme Court decisions, to a situation where such application is required by the force and logic of the Court's decisions." Id. Although the methodology employed in Davis is different from that applied in the original Report and Recommendation, the ultimate conclusions reached by the Report and Recommendation remain unchanged.

14

1500 (9th Cir.) (en banc), cert. denied, 118 S. Ct. 586 (1997); Drinkard v. Johnson, 97 F.3d 751, 768 (5th Cir. 1996), cert. denied, 117 S. Ct. 1114 (1997); Lindh v. Murphy, 96 F.3d 856, 869 (7th Cir. 1996)(en banc), rev'd on other grounds, 521 U.S. 320 (1997). Questions of federal law are reviewed to determine whether the state court decision is contrary to "an authoritative decision of the Supreme Court." Moore v. Calderon, 108 F.3d 261, 264 (9th Cir.), cert. denied, 117 S. Ct. 2497 (1997); Lindh v. Murphy, 96 F.3d at 869.

State court determinations of mixed questions of law and fact are reviewed for "reasonableness." See Moore v. Calderon, 108 F.3d at 265 n.3; Lindh v. Murphy, 96 F.3d at 870-71. A federal court must determine whether the state ruling on a mixed question of law and fact involved an unreasonable application of clearly established federal law. See Drinkard v. Johnson, 97 F.3d at 767-769; Lindh v. Murphy, 96 F.3d at 870-71; see also O'Brien v. DuBois, 145 F.3d 16, 24 (1st Cir. 1998)(a federal court must determine "whether the state court's use of (or failure to use) existing law in deciding the petitioner's claim involved an 'unreasonable application' of Supreme Court precedent").

The Court accords "great deference" to a state court's factual findings, which are presumed to be correct unless the petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. §2254(e)(1); Jeffries v. Wood, 114 F.3d at 1499-1500; Drinkard v. Johnson, 97 F.3d at 767.

///

///

As discussed below, Petitioner does not satisfy the AEDPA's standard for a grant of the writ; thus, the Petition should be denied.

## B.    INTRODUCTION OF "FALSE EVIDENCE"

In claim one, Petitioner contends Detective Martin's final transcript of the tape recording constituted "false evidence" and thus its introduction violated his due process right to a fair trial.

In support of this claim, Petitioner relies on the rule that the prosecution's knowing presentation of false evidence violates the defendant's right to due process of law. Napue v. Illinois, 360 U.S. 264, 269 (1959); Mooney v. Holohan, 294 U.S. 103, 112 (1935). To merit habeas relief for such a claim, Petitioner must show that Detective Martin's transcript was false. See United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.), cert. denied, 516 U.S. 945 (1995); United States v. Young, 17 F.3d 1201, 1203-04 (9th Cir. 1994).

The evidence at trial clearly showed the tape recorded conversation between Petitioner and Mr. Leater was difficult to understand. [R.T. 3046, 3115, 3248-51.] Detective Martin listened to the tape over one hundred times and worked over an extended period of time to produce the final transcript that was used to assist the jury at trial. [R.T. 3046-47.] Petitioner's attorney cross-examined Detective Martin concerning the accuracy of the final transcript [R.T. 3069-75, 3083-84, 3097-99], introduced Detective Martin's preliminary transcripts [R.T. 3093-96], and introduced a competing transcript prepared by Ms. Oldknow. [R.T. 3245-46.] The trial court instructed

the jury that the tape recording itself was the actual evidence, and that the transcripts were a guide to assist the jury in understanding the contents of the tape.  [R.T. 3052, 3293.]  Thus, the jury was responsible for determining the actual content of the tape recording, with the various transcripts as guides.

To support his claim that Detective Martin's transcript was "false," Petitioner submits the declaration of Dr. Roger Shuy, a linguistics expert.  [Petition, ex. F.]  Dr. Shuy listened to the final enhanced tape recording and compared it to the final transcript prepared by Detective Martin.  [Petition, ex. F at 2.]  Dr. Shuy determined that Detective Martin's transcript was inaccurate, and concluded it was "useless as a guide to the contents of the tape recording."  [Petition, ex. F at 5.]  Dr. Shuy, however, noted that "[t]he glaring inaccuracies in the government transcript were not necessarily intentional."  [Petition, ex. F at 5.]  In support of the Petition, Petitioner submits a transcript prepared by Dr. Shuy. [Petition, ex. G.]

The final transcript prepared by Detective Martin represented Detective Martin's interpretation of the contents of the tape recording.  Petitioner does not show Detective Martin's transcript was "false" merely because it differed from the transcript prepared by Dr. Shuy.  See United States v. Workinger, 90 F.3d 1409, 1416 (9th Cir. 1996)(holding that the defendant's disagreement with a witness's interpretation of the evidence did not render the witness's testimony false); United States v. Zuno-Arce, 44 F.3d at 1422-23 (holding that

discrepancies between the testimony of different witnesses were not sufficient to show the witnesses lied).[6]

The California Court of Appeal concluded "[t]he fact Dr. Shuy interpreted the conversation differently than the prosecution does not automatically make his version 'correct' and the prosection's 'false.' Instead this points out different persons can have differing opinions and an honest dispute about some of the less easily audible portions of the tape." [Return, ex. D at 309.] Petitioner does not show the Court of Appeal's conclusion was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Accordingly, this claim should be denied.

## C.    ADMISSION OF THE TAPE RECORDING AND TRANSCRIPT

In claim three, Petitioner asserts that his due process right to a fair trial was violated by the introduction of the tape recording and Detective Martin's final transcript.

---

[6] In the Objections, Petitioner appears to contend that because Dr. Shuy is an expert, his finding that Detective Martin's transcript was false is the equivalent of proof that Detective Martin's transcript was false. [Objections at 3-4]. An expert's opinion, however, is not proof of a fact, but must be evaluated and weighed by the trier of fact. See CALJIC 2.80; Devitt & Blackmar, Federal Jury Practice and Instructions § 14.01 (1992); see also Standard Oil Co. of California v. Perkins, 347 F.2d 379, 388 (9th Cir. 1965)("Expert testimony, in common with all testimony, merely establishes probability, not certainty. Even great probability is not certainty. And it remains the exclusive function of the jury to assess the relative probabilities and establish the facts.").

## 1.    Factual Background

The admissibility of the tape recorded conversation between Petitioner and Mr. Leater was the subject of lengthy pretrial proceedings.  The trial court first denied Petitioner's motion to suppress the tape recording on the ground that it was obtained without a warrant.  [R.T. 82-83, 151-53.]  The trial court also considered Petitioner's motion to exclude the tape recording on the ground that it was substantially unintelligible.[7]  [R.T. 104, 111.]  The trial court noted that it had listened to the tape recording twice in conjunction with the final transcript prepared by Detective Martin.  [R.T. 104, 113-14.]  The court stated that it heard "essentially" all of the words noted in the transcript, although the court had to listen to parts of the tape twice to hear everything.  [R.T. 114, 168-69.]  The court found there were "a lot more" unintelligible portions on the tape recording than were indicated in the transcript.  [R.T. 114].  The court also noted there was "a lot" it could not understand.  [R.T. 114.]  The court concluded, however, that the inaudible portions of the recording did not render the recording untrustworthy.  [R.T. 169.]

Prior to the presentation of evidence in Petitioner's case, Petitioner's attorney again raised the question of the admissibility of the tape recording.  The trial court stated that it had listened to the tape "many times" during the pretrial hearing and Mr. Leater's trial, which had been conducted prior to Petitioner's trial.  [R.T.

---

[7]  The process used to enhance the tape recording was not challenged.  [R.T. 118-19.]

19

2598.] The court stated that it was "comfortable with the accuracy of [Detective Martin's] transcript within reason." [R.T. 2598.] The court affirmed its prior ruling to admit the recording and allow the transcript to be used to assist the jury. [R.T. 2598.] Two portions of irrelevant material were excised from the final tape played for the jury in Petitioner's trial. [R.T. 2599-2600.]

The tape recording first was played for the jury during Detective Martin's testimony. [R.T. 3053.] Before the tape was played, the trial court admonished the jury as follows:

> Ladies and gentlemen, let me just explain as the transcripts are being handed out, we have one that's marked that goes into evidence. These are available for your assistance only.
>
> I want to remind you even with respect to the marked exhibit that it is simply for your assistance. The true evidence is the tape itself. I don't think either side is stipulating to the accuracy of every single word on there.
>
> You may hear things differently when you hear the tape. You are to go with the tape itself, not the transcript. The transcript is simply for your assistance.
>
> Now, while you have the transcripts here for each of you now, don't write on them because we'll be collecting them again. At the time you deliberate, you'll have the one original and the tape itself. But this is just for your assistance while we're playing it here in court.

[R.T. 3052.]

The tape recording was played a second time during the testimony of Mr. Duncan, the investigator who helped Detective Martin prepare the final transcript. [R.T. 3294.] Before playing the tape, the trial court reminded the jury the tape recording was the true

evidence, and the transcripts were available simply to assist the jury in listening to the tape.  [R.T. 3293.]

Petitioner's trial attorney cross-examined Detective Martin at length concerning discrepancies between the statements made and the identity of the speakers in the initial, interim and final versions of the transcript.  [R.T. 3069-75, 3083-84, 3097-99.]  Petitioner's attorney also cross-examined Mr. Duncan concerning discrepancies between the final transcript and the transcript prepared by Ms. Oldknow, the defense paralegal.  [R.T. 3298-3305.]

The trial court issued the following instruction to the jury prior to deliberations:  "Certain evidence was admitted for a limited purpose.  That specifically is the transcript or transcripts relating to the tape.  At the time this evidence was admitted, you were admonished it could not be considered by you for any purpose other than the limited purpose for which it was admitted.  Do not consider such evidence for any purpose except the limited purpose for which it was admitted."  [R.T. 3331.]  The appropriate interpretation of the tape recording was hotly contested by the parties during final argument.  [R.T. 3394, 3404-09 (prosecution); 3428-34 (defense); 3448-54 (prosecution).]

The California Court of Appeal noted that it listened to the tape recording and found it difficult to understand the first time.  People v. Polk, 47 Cal. App. 4th at 953; [Return, ex. D at 300.]  The Court of Appeal further stated, "[o]nce acclimated to the voices, background

21

noise and the like, it is our opinion the tape contains several audible portions which are understandable even without the aid of a transcript. Certain of these audible portions relate to matters clearly relevant to this case." People v. Polk, 47 Cal. App. 4th at 953; [Return, ex. D at 300.] The Court of Appeal also compared the tape to the transcripts and found that there appeared to be inaccuracies in both the prosecution and defense transcripts. People v. Polk, 47 Cal. App. 4th at 955; [Return, ex. D at 302.] Nonetheless, the Court of Appeal concluded "it is our opinion the transcript prepared by the prosecution was sufficiently accurate in material respects to justify its use by the jury." People v. Polk, 47 Cal. App. 4th at 955; [Return, ex. D at 302.] In particular, the Court of Appeal noted that "in a clearly audible portion of the tape Leater asks Polk how many shots he got off. The People's transcript accurately ascribes this question to Leater. This exchange is sufficiently material by itself to make the other alleged inaccuracies less significant." People v. Polk, 47 Cal. App. 4th at 955; [Return, ex. D at 303.]

## 2.    Admission of the Tape Recording

Petitioner contends the trial court violated his due process rights by admitting the tape recording into evidence.

State evidentiary rulings concerning the admission of evidence generally are not cognizable in a federal habeas proceeding, unless the admission of the evidence violated the petitioner's due process

22

right to a fair trial. Estelle v. McGuire, 502 U.S. 62, 70 (1991); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990). To establish a due process violation, Petitioner must demonstrate the trial court's ruling was so prejudicial that it rendered his trial fundamentally unfair. See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

The admissibility of a tape recorded conversation is committed to the sound discretion of the trial court. United States v. Lane, 514 F.2d 22, 27 (9th Cir. 1975). "A recorded conversation is generally admissible unless the unintelligible portions are so substantial that the recording as a whole is untrustworthy." United States v. Tisor, 96 F.3d 370, 376 (9th Cir. 1996), cert. denied, 117 S. Ct. 1012 (1997)(quoting United States v. Lane, 514 F.2d at 27). Although portions of a tape recording may be unintelligible, this factor alone does not render the recording inadmissible. See United States v. Lane, 514 F.2d at 27; United States v. Carlson, 423 F.2d 431, 440 (9th Cir.), cert. denied, 400 U.S. 847 (1970).

Petitioner submitted a copy of the tape recording for this Court's review. During an initial review of the tape recording, without the aid of a transcript, much of the conversation was difficult to discern. Upon listening to the recording with the assistance of Detective Martin's final transcript, however, the Court was able to hear substantially all of the words transcribed by Detective Martin. Thus, the transcript served its purpose as a listening aid, assisting the listener in deciphering the content of

the tape, without having to resort to numerous hours of analysis.  In particular, as noted by the California Court of Appeal, the exchange in which Mr. Leater asks Petitioner, "How many shots you got off?" is clearly audible without the transcript.  Approximately thirty percent of the tape recording appears to be unintelligible, which is consistent with the testimony of Mr. Duncan and Ms. Oldknow.  [R.T. 3255, 3305.]  Since the tape recording was substantially intelligible, Petitioner does not show the trial court's ruling to admit the recording rendered his trial fundamentally unfair.  See Cape v. United States, 283 F.2d 430, 435 (9th Cir. 1960) (holding that a partially inaudible tape recording was properly admitted into evidence because the inaudible portions were not substantial).[8]

As discussed above, the trial court and Court of Appeal also concluded the tape was substantially intelligible.  People v. Polk, 47 Cal. App. 4th at 953; [Return, ex. D at 300; R.T. 168-69.]  This factual finding is presumed to be correct.  See 28 U.S.C. § 2254(e)(1); United States v. Saccoccia, 58 F.3d 754, 781 (1st Cir. 1995), cert. denied, 517 U.S. 1105 (1996) (the determination of the

_____

[8]  In the Objections, Petitioner contends that in claim three he contests the trial court's admission of certain unintelligible portions of the tape recording, which were transcribed by Detective Martin to attribute incriminating statements to Petitioner.  [Objections at 17-19.]  The case law cited above indicates that a trial court may admit a tape recording that is partially unintelligible, as long as the recording as a whole is substantially intelligible.  The fact that there was a dispute about the proper interpretation of portions of the recording did not render those portions unintelligible, but rather, created a question of fact for the jury to resolve.

intelligibility of a tape recording is a question of fact); United States v. Reynolds, 801 F.2d 952, 955 (7th Cir. 1986)(the determination of the accuracy of a transcribed statement of a recorded conversation is a question of fact); Chavez v. Dickson, 280 F.2d 727, 738 (9th Cir. 1960)("Chavez I"), cert. denied, 364 U.S. 934 (1961)(same); see also Thompson v. Keohane, 516 U.S. 99, 109-10 (1995)(a question of fact involves "'basic, primary or historical facts: facts in the sense of a recital of external events and the credibility of their narrators'")(quoting Townsend v. Sain, 372 U.S. 293, 309 n.6 (1963)); Nevius v. Sumner, 852 F.2d 463, 469 (9th Cir. 1988), cert. denied, 490 U.S. 1059 (1989)(the presumption of correctness attaches to findings by both state trial courts and state appellate courts).

Petitioner has the burden of rebutting the presumption of correctness "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). To rebut the finding that the tape was substantially intelligible, Petitioner presents the declaration of Dr. Shuy. Dr. Shuy states the tape was "extremely difficult to hear," and as a result he had to listen to the tape many times on different machines in order to understand it. [Petition, ex. F at 3.] Dr. Shuy, however, does not make any comment on the intelligibility of the tape as a whole. The fact that Dr. Shuy was able to produce his own transcript of the content of the recording suggests he found the tape to be substantially intelligible. Thus, Dr. Shuy's declaration does not constitute "clear and convincing evidence" that the transcript was unintelligible or that the state courts erred in finding the tape

recording was substantially intelligible. Cf. Jeffries v. Wood, 114 F.3d at 1500 (holding that an affidavit concerning juror misconduct filed with the trial court within days of the jury's verdict provided clear and convincing evidence that the state court's finding that the misconduct was not reported for over two years after trial was erroneous).

The California Court of Appeal determined the admission of the tape recording did not violate Petitioner's right to a fair trial. People v. Polk, 47 Cal. App. 4th at 953; [Return, ex. D at 300.] Petitioner does not show the Court of Appeal's conclusion was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Accordingly, this claim should be denied.

### 3.   Admission of Detective Martin's Transcript

Petitioner also claims the trial court violated his due process rights by admitting Detective Martin's final transcript as evidence.

The use of transcripts to assist the jury in listening to a tape recording is generally "committed to the sound discretion of the trial court." United States v. Plunk, 153 F.3d 1011, 1026 (9th Cir. 1998), amended, 161 F.3d 1195 (9th Cir. 1998), petition for cert. filed, 67 U.S.L.W. 3377 (U.S. Nov. 27, 1998)(No. 98-899); United States v. Tisor, 96 F.3d at 377. "[A]s a general proposition, transcripts are

appropriately used as an aid in listening to the tape recording itself, which constitutes actual evidence of the conversations." United States v. Tornabene, 687 F.2d 312, 317 (9th Cir. 1982); United States v. Turner, 528 F.2d 143, 167 (9th Cir.), cert. denied, 423 U.S. 996 (1975) & 429 U.S. 837 (1976).  The admission of a transcript to aid the jury in listening to a tape recording does not violate due process unless the transcript was "grossly inaccurate, to the substantial prejudice" of the defendant.  Chavez v. Dickson (Chavez I), 280 F.2d at 737-38.

In evaluating a trial court's ruling to permit the use of a transcript as a listening aid, the Court considers the following criteria:  "(1) whether the [trial] court reviewed the transcript for accuracy; (2) whether defense counsel was allowed to highlight alleged inaccuracies and to introduce alternative versions; (3) whether the jury was instructed that the tape, rather than the transcript, was evidence; and (4) whether the jury was allowed to compare the transcript to the tape and hear counsel's arguments as to the meaning of the conversations."  United States v. Armijo, 5 F.3d 1229, 1234 (9th Cir. 1993); see also United States v. Tisor, 96 F.3d at 377; United States v. Booker, 952 F.2d 247, 249 (9th Cir. 1991).

Each of these criteria was satisfied in Petitioner's case. The trial court and the Court of Appeal found the transcript was substantially accurate.  People v. Polk, 47 Cal. App. 4th at 955;

[Return, ex. D at 302; R.T. 114, 168-69, 2598.][9]  Upon reviewing the tape recording with the assistance of Detective Martin's transcript, the Court also finds the transcript was substantially accurate.

With respect to the remaining factors, the trial court permitted the jury to review Detective Martin's two preliminary transcripts and the competing defense transcript, to determine which, if any, accurately reflected the content of the tape.  [R.T. 3285.]  The trial court issued three limiting instructions concerning the use of the transcripts, emphasizing that the tape was the true evidence.  [R.T. 3052, 3293, 3331.]  Finally, the jury had an opportunity to compare the four transcripts and to consider the arguments of Petitioner's attorney concerning the tape's content.  [R.T. 3394, 3404-09, 3428-34, 3448-54.]  By giving Petitioner's attorney wide latitude to cross-examine Detective Martin about the transcript and the two preliminary transcripts, and by allowing the defense to introduce its own transcript, the trial court ensured that Petitioner had ample opportunity to contest the accuracy of Detective Martin's final transcript.  The safeguards employed by the trial court were adequate to protect Petitioner's due process rights.  See United States v. Plunk, 153 F.3d at 1026 (holding that the trial court did not abuse

---

[9]  In the Objections, Petitioner states that the California Court of Appeal did not make a finding with respect to the accuracy of certain contested statements contained in the transcript.  [Objections at 21.]  The Court of Appeal stated, "it is our opinion the transcript prepared by the prosecution was sufficiently accurate in material respects to justify its use by the jury."  People v. Polk, 47 Cal. App. 4th at 955; [Return, ex. D at 302.]  The Court of Appeal was not required to identify line by line which portions of the transcript it found to be accurate.

its discretion because it utilized appropriate procedures in admitting transcripts as a listening aid); United States v. Tisor, 96 F.3d at 377 (same); United States v. Armijo, 5 F.3d at 1234-35 (same); United States v. Booker, 952 F.2d at 250 (same); United States v. Chen, 754 F.2d 817, 824 (9th Cir.), cert. denied, 471 U.S. 1139 (1985)(same); United States v. Rinn, 586 F.2d 113, 118 (9th Cir. 1978), cert. denied, 441 U.S. 931 (1979)(same); United States v. Turner, 528 F.2d at 167-68 (same); United States v. Lane, 514 F.2d at 27 (same); cf. Chavez v. Dickson (Chavez I), 280 F.2d at 737-38 (remanding case to district court to determine the accuracy of a transcript where the state trial court did not conduct its own review of the transcript's accuracy).[10]

To prove the admission of Detective Martin's transcript violated his due process rights, Petitioner must rebut the presumption of correctness accorded to the trial court and Court of Appeal's finding that the transcript was accurate. See United States v. Reynolds, 801 F.2d at 955 (the determination of the accuracy of a transcribed statement of a recorded conversation is a question of fact); Chavez v. Dickson (Chavez I), 280 F.2d at 738 (same); cf. Chavez v. Dickson ("Chavez II"), 300 F.2d 683, 688 (9th Cir.), cert. denied, 371 U.S.

_____

[10]   In the Objections, Petitioner contends that these cases are inapposite because in his case, the transcripts were actually admitted into evidence.  [Objections at 20.]  Whether the transcripts were formally received into evidence as exhibits or simply provided to the jury along with the tape recordings is a matter of over substance.  Critically, the trial court admonished the jury that the transcripts were to be used as listening aids. [R.T. 3052, 3293, 3331.]

880 (1962)(the determination of the prejudicial effect of a transcribed statement is a mixed question of law and fact).

In support of Petitioner's claim, Dr. Shuy states that Detective Martin's transcript contained "glaring inaccuracies," and was "useless as a guide to the contents of the tape recording." [Petition, ex. F at 5.] Dr. Shuy's assessment of the transcript, however, merely contradicts the findings of the trial court and the Court of Appeal. The declaration does not provide clear and convincing evidence that the transcript was inaccurate or that the state courts' evaluation of the transcript was erroneous.

In particular, one of the most incriminating portions in Detective Martin's transcript is the following exchange:

Mr. Leater:  "How many shots you got off?"

Petitioner:  "Four."

[Petition, ex. A at 2.]

As discussed above, the California Court of Appeal specifically noted that this exchange was "clearly audible" and accurate. People v. Polk, 47 Cal. App. 4th at 955; [Return, ex. D at 303.] The Court also finds this exchange to be clearly audible. Dr. Shuy interpreted the exchange as follows:

Mr. Leater:  "How many shots you got off?  Four?"

Petitioner:  "(laughs) They told five."

[Petition, ex. G at 4.]

The difference between Detective Martin's interpretation and Dr. Shuy's interpretation involves a question of the reasonable interpretation of the tape and does not demonstrate that Detective Martin's transcript was grossly inaccurate. Furthermore, a line by line comparison of the two transcripts shows there are numerous statements and exchanges that are interpreted in the same manner in both transcripts. Thus, Dr. Shuy's transcript does not show by clear and convincing evidence that the state courts' evaluation of Detective Martin's transcript was erroneous. See, e.g., Chavez v. Dickson (Chavez II), 300 F.2d at 688 (holding that "such variances as there were between the transcript and the intelligible portions of the tape recording were of a minor nature and did not prejudice" the defendants).

Petitioner's reliance on United States v. Robinson, 707 F.2d 872 (6th Cir. 1983), is unavailing. In that case, the trial court admitted tape recordings of conversations between the defendants and government agents who were investigating the underlying crimes. Id. at 874. Since "substantial portions of the tape recordings were inaudible," the government produced transcripts of the conversation to assist the jury in listening to the tape. Id. The trial court, however, did not review the transcripts for accuracy. Id. at 877. Furthermore, the circuit court concluded that "several of the tapes [were] so inaudible that it would be impossible to transcribe them without an independent recollection of the conversations." Id. The circuit court reversed the defendant's conviction because the trial court did not employ the appropriate safeguards before admitting the

31

transcripts. Id. at 879. Robinson is inapposite to Petitioner's case, because, as discussed above, the tape recording of Petitioner's conversation was substantially intelligible and trial court utilized the proper safeguards in admitting Detective Martin's final transcript as a listening aid.

The California Court of Appeal concluded that the admission of Detective Martin's transcript did not violate Petitioner's right to a fair trial. People v. Polk, 47 Cal. App. 4th at 955; [Return, ex. D at 302-03.] Petitioner does not show the Court of Appeal's conclusion was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Accordingly, this claim should be denied.

C.    ASSISTANCE OF COUNSEL

In claims two, four and five, Petitioner challenges the adequacy of his trial attorney's representation.

To prove a claim of ineffective assistance of counsel, Petitioner must show that his attorney's representation fell below an objective standard of reasonableness. Strickland v. Washington, 466 U.S. 668, 688 (1984). In proving this element of his claim, Petitioner must overcome the strong presumption that his attorney exercised reasonable professional judgment. See id. at 689-90; Lagrand v. Stewart, 133 F.3d 1253, 1271 (9th Cir.), cert. denied, 119 S. Ct. 422 (1998). In

evaluating this prong of the Strickland test, the Court focuses on whether the attorney's conduct was appropriate under the circumstances existing at the time of the trial. See Strickland v. Washington, 466 U.S. at 690; Lagrand v. Stewart, 133 F.3d at 1271.

Petitioner also must prove he was prejudiced by demonstrating a reasonable probability that but for his counsel's errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Thus, under this component, Petitioner must demonstrate his counsel's error rendered the result unreliable or the trial fundamentally unfair. Fretwell v. Lockhart, 506 U.S. 364, 372 (1993); Strickland v. Washington, 466 U.S. at 694.

Petitioner must prove both elements. The Court may reject his claim upon finding either that counsel's performance was reasonable or that the claimed error was not prejudicial. Strickland v. Washington, 466 U.S. at 697; Lagrand v. Stewart, 133 F.3d at 1270.

### 1. Retention of an Expert to Examine the Original Tape Recording

In claim four, Petitioner contends his trial attorney rendered ineffective assistance of counsel because he failed to obtain the original tape recording of Petitioner's conversation with Mr. Leater and retain an expert to examine it.

In support of this claim, Petitioner presents a declaration by his trial attorney, who admits he did not retain an expert to examine either the original or enhanced tape recording. [Petition, ex. D at 2.] The attorney explains, "I did not have experts examine the tape because I believed that if the experts determined that Mr. Polk had, in fact, made incriminating remarks on the tape, I would have been forced to provide that information to the state under the reciprocal discovery statutes." [Petition, ex. D at 2.]

California's reciprocal discovery laws were enacted on June 5, 1990, when the voters approved Proposition 115. Izazaga v. Superior Court, 54 Cal. 3d 356, 363 (1991). Pursuant to Proposition 115, a new chapter on discovery was added to the California Penal Code. See id. at 364; Cal. Penal Code §§ 1054-1054.7. Section 1054.3, governing the disclosure of information by the defense to the prosecution, provides:

> The defendant and his or her attorney shall disclose to the prosecuting attorney: (a) the names and addresses of persons, other than the defendant, he or she intends to call as witnesses at trial, together with any relevant written or recorded statements of those persons, or reports of the statements of those persons, including any reports or statements of experts made in connection with the case, and including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the defendant intends to offer in evidence at the trial.

Cal. Penal Code § 1054.3(a).

The reciprocal discovery provisions had been in effect for approximately two years at the time of Petitioner's trial, which began in August 1992. [R.T. 2580.] In August 1991, one year prior to Petitioner's trial, the California Supreme Court issued a major

opinion analyzing the constitutionality of the reciprocal discovery statutes. _Izazaga v. Superior Court_, 54 Cal. 3d 356. In _Izazaga_, the California Supreme Court clarified that "under the new discovery chapter, a criminal defendant need disclose only those witnesses (and their statements) the defendant intends to call at trial. It is logical to assume that only those witnesses defense counsel deems helpful to the defense will appear on a defendant's witness list. The identity of damaging witnesses that the defense does not intend to call at trial need not be disclosed. Thus, there is nothing in the new discovery chapter that would penalize exhaustive investigation or otherwise chill trial preparation of defense counsel...." _Id._ at 379.

In addition to the foregoing language, the _Izazaga_ opinion emphasizes repeatedly that the prosecution's right to discovery is premised on the defendant's intention to call a witness to testify at trial. _Id._ at 374, 375, 377 n.14 & 380. Thus, _Izazaga_ and the plain language of section 1054.3 together indicate that the prosecution is not entitled to the discovery of reports prepared by experts whom the defendant does not intend to call at trial.

Petitioner's attorney would not have been required to disclose the identity of, or the reports prepared by, an expert whose testimony would have been damaging to Petitioner, because the attorney presumably would not have called the expert as a witness. _See Izazaga v. Superior Court_, 54 Cal. 3d at 379. Thus, the attorney's belief that he would be required to disclose reports prepared by a defense expert, even if the expert's opinion proved adverse to his client,

indicates the attorney had a limited understanding of California's reciprocal discovery provisions. This conclusion is supported by the declaration of Brendan Conroy, an experienced criminal defense attorney, who states that the trial attorney's interpretation of the reciprocal discovery requirements was unreasonable. [Petition, ex. K at 5.]

Petitioner's attorney recognized the tape recording was an "extremely important" piece of evidence. [Petition, ex. D at 1-2.] Based on the critical nature of the tape recording, and the fact that the tape was difficult to hear, Mr. Conroy opines that a reasonably competent attorney would have retained an expert to analyze the original tape. [Petition, ex. K at 4-5.]

Notwithstanding Mr. Conroy's assessment of Petitioner's attorney's performance, the test for competent performance under Strickland "has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." Coleman v. Calderon, 150 F.3d 1105, 1113 (9th Cir.), cert. denied, 119 S. Ct. 625 (1998), rev'd on other grounds, 119 S. Ct. 500 (1998). Furthermore, because the attorney's performance is evaluated under an objective standard of review, Petitioner's trial attorney's subjective reason for not retaining an expert is not dispositive. See Bonin v. Calderon, 59 F.3d 815, 838 (9th Cir. 1995), cert. denied, 516 U.S. 1051 (1996) (emphasizing that because the court uses an objective

36

standard to evaluate counsel's competence, it is unnecessary to inquire into the subjective reasons for counsel's performance); Morris v. California, 966 F.2d 448, 456-57 (9th Cir. 1991), cert. denied, 506 U.S. 831 (1992)(in evaluating an attorney's performance, the court need not determine the actual reason for an attorney's actions, as long as the act falls within the range of reasonable representation).

During the original motion to suppress the enhanced tape recording, Petitioner's trial attorney commented that "[t]here may be an issue as to how the tape was enhanced, but I am sure it was done professionally."  [R.T. 118.]  In response, the trial court stated, "It's pretty standard these days.  I haven't had a case yet that hasn't had an enhancement somewhere.  I don't see that as an issue."  [R.T. 118.]  The trial court's comment indicates that a reasonable trial attorney could have decided that further investigation of the original tape and the enhancement methods used by the government would not prove to be fruitful.

To support his claim that his attorney should have retained an expert to examine the original tape, Petitioner points to Dr. Shuy's statement that some enhancement methods clarify the voices and words on the recording, but others compromise the recorded quality of the voices and words.[11]  In examining a copy of the enhanced tape introduced at Petitioner's trial, Dr. Shuy noted a few instances in

---

[11]  Petitioner also submits a hearsay statement by his attorney, who explains that another audio expert provided her with essentially the same information.  [Petition, ex. H at 2-3.]

37

which it sounded as if the tape player had been turned off and on. [Petition, ex. F at 3.] Dr. Shuy's statement, however, does not indicate the enhancement process used in Petitioner's case was one of the inferior processes. The fact that the enhanced tape was substantially intelligible indicates the enhancement process did not compromise the overall quality of the tape recording. Thus, Petitioner does not present sufficient facts to show his trial attorney had a reason to question the integrity of the enhancement process and to examine the original tape. See, e.g., Coleman v. Calderon, 150 F.3d at 1113-14 (finding that a trial attorney acted reasonably even though he failed to examine the back of a chair for blood, because the record showed the attorney had no reason to believe blood was present on the chair).

Petitioner also argues that if his attorney had retained an expert to examine the original tape recording, the expert might have found the inculpatory statements attributed to Petitioner at trial were improperly transcribed. There are no facts in the record, however, indicating that Petitioner's attorney should have had a reason to believe that such a result would obtain.

Furthermore, Petitioner's trial attorney could have made an objectively reasonable strategy decision to utilize cross-examination of Detective Martin as a means to challenge the interpretation of the enhanced tape, rather than to employ an expert to achieve the same result. See, e.g., Coleman v. Calderon, 150 F.3d at 1114 (although trial counsel did not request a continuance to consult an expert

38

concerning blood test results, he nonetheless performed adequately by effectively cross-examining the prosecution's witness concerning his performance of the blood test).  As discussed above, Detective Martin admitted that in enhancing the tape, certain words were lost in an effort to make the tape more intelligible as a whole.  [R.T. 3104, 3109-10, 3113-14, 3115-16.]  Moreover, the record shows that Petitioner's attorney worked vigorously to undermine the evidentiary value of the tape, first by moving to suppress the recording altogether [R.T. 104, 111], then by cross-examining Detective Martin concerning the content of the final transcript [R.T. 3069-75, 3083-84, 3097-99], and then by introducing the competing defense transcript and Detective Martin's preliminary transcripts.  [R.T. 3285.][12] Petitioner's attorney's performance stands in stark contrast to those cases in which the trial attorney did nothing to respond to a critical piece of the prosecution's case.  See Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) (noting that the reviewing court should assess counsel's overall performance throughout the case); cf. Turner v. Duncan, No. 97-56098, -- F.3d --, 1998 WL 809549 at *6-*7 (9th Cir. Oct. 8, 1998, amended Nov. 24, 1998) (finding that defense attorney's total failure to investigate and prepare a defense constituted deficient performance); Jones v. Wood, 114 F.3d 1002, 1009 (9th Cir. 1997) (remanding case for discovery because the petitioner alleged

---

[12]    Respondents refer to a declaration by the deputy attorney general who prepared the return to Petitioner's state habeas petition.  The declaration includes hearsay information, in which the deputy explains that Petitioner's trial attorney told him that his trial strategy was to undermine the reliability of the tape recording as a whole by introducing the various transcripts.  [Return, ex. K at 461-62.]

sufficient facts to show that his attorney's complete failure to investigate the source of blood found on the petitioner's clothing constituted deficient performance); United States v. Tarricone, 996 F.2d 1414, 1418-19 (2d Cir. 1993)(remanding case for an evidentiary hearing because the defendant presented sufficient facts to show that his attorney's decision to rely on the jury's ability to detect differences in handwriting on critical documents, in lieu of retaining a handwriting expert, constituted deficient performance, where the differences in handwriting were not apparent to a layperson).

In analyzing this issue on direct appeal, the California Court of Appeal noted that the evidence at trial showed the original tape was unintelligible and the enhancement process deleted certain words from the tape. The Court of Appeal concluded that defense counsel was not required to present expert testimony concerning these same facts. The Court of Appeal also concluded that defense counsel exercised reasonable strategy by using the gaps and pauses on the tape to attack its reliability. [Return, ex. D at 312-13.] Petitioner does not show the Court of Appeal's conclusion was unreasonable. See 28 U.S.C. § 2254(d); O'Brien v. Dubois, 145 F.3d at 25 (holding that "the 'unreasonable application' clause does not empower a habeas court to grant the writ merely because it disagrees with the state court's decision, or because, left to its own devices, it would have reached a different result. Rather, for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes"); Hall v. Washington, 106

F.3d 742, 748-49 (7th Cir.), cert. denied, 118 S. Ct. 264 (1997) ("[t]he statutory 'unreasonableness' standard allows the state court's conclusion to stand if it is one of several equally plausible outcomes"); Drinkard v. Johnson, 97 F.3d at 769 (holding that habeas relief is warranted "only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists"). Accordingly, this claim should be denied.

> **2.   Retention of an Expert to Examine the Enhanced Tape Recording**

In claim two, Petitioner claims his trial attorney rendered ineffective assistance of counsel because he failed to retain an expert to examine the enhanced version of Petitioner's tape recorded conversation and produce a reliable transcript.

As discussed above, Petitioner's attorney could have made an objectively reasonable strategic decision to rely on cross-examination and Ms. Oldknow's transcript to rebut the reliability of Detective Martin's transcript, rather than relying on an expert. With respect to claim two, Petitioner also fails to satisfy the prejudice prong of the Strickland test.

To prove prejudice, Petitioner must demonstrate a reasonable probability that if an expert had been retained, the result of the trial would have been different. Strickland v. Washington, 466 U.S. at 694. In making this determination, the Court must consider the

totality of the evidence presented at trial, and the effect of counsel's error on that evidence.  Id. at 695-696; see Coleman v. Calderon, 150 F.3d at 1116.  In Petitioner's case, the Court must consider the content of the expert's proposed testimony, and how that testimony would have affected the evidence presented at trial.  This requires a detailed evaluation of the testimony concerning the tape and the various transcripts.

As discussed above, the evidence presented in Petitioner's trial clearly showed the tape recording was difficult to understand and was subject to varying interpretations.  Thus, the jury was well aware that a key issue in the case was the interpretation of the tape recording.

The tape recording, the four transcripts introduced at trial, and Dr. Shuy's transcript all show that Petitioner's conversation with Mr. Leater included a discussion of the charges pertinent to this case. [Petition, exs. A, B, C, E & G.]  The overall context of the conversation indicates that Petitioner and Mr. Leater either were discussing their actions during the course of the murders, or discussing the accusations made by the police concerning their alleged actions, or both.  The following statements by Petitioner, which are included in both Detective Martin's final transcript and Dr. Shuy's transcript, indicate that Petitioner was not involved in the murders: "Man, I ain't worried about that, man -- I ain't did no crime." [Petition, ex. A at 1; ex. B at 1; ex. C at 1; ex. E at 2; ex. G at

///

42

3]; "We ain't done the motherfucker, you know what I'm saying. Ain't no reason, you understand." [Petition, ex. A at 6; ex. G at 10.]

There are two inculpatory exchanges on the tape recording whose interpretation the parties contested at trial. The final version of Detective Martin's transcript contained the following exchange:

Petitioner: "I ain't mean no disrespect, man, but I ain't saying nothing until I talk to a lawyer."

Mr. Leater: "Yeah. Oh, ah they trying to say uh, you uh (unintelligible) ... How many shots you got off?"

Petitioner: "Four."

Mr. Leater: "(laughter) The gun holds five. They done took my shoes, man, they done took my shoes, man. I'll tell you what you know aah. They got a witness saw your car."

[Petition, ex. A at 2.]

This exchange is significant. Assuming that Petitioner was discussing his actions on the night of the murder, this exchange indicates Petitioner was the person who fired the shots at the victims. On the other hand, Mr. Leater's reference to "they trying to say" suggests Petitioner and Mr. Leater might have been discussing the accusations aimed at them by the police, rather than discussing their actual conduct.

During cross-examination of Detective Martin, Petitioner's attorney addressed inconsistencies in Detective Martin's analysis of the exchange. Detective Martin admitted he initially was unsure

43

whether it was Petitioner or Mr. Leater who asked, "How many shots you got off?," and which one responded, "Four."  [R.T. 3069-70, 3097-99.]

Ms. Oldknow, the defense paralegal, transcribed the exchange as follows:

Petitioner:  "I ain't mean no disrespect man, but I ain't sayin' nothin' until I talk to a lawyer (...)"

Mr. Leater:  "Yeah (...) oh they tryin to say (...)"

Petitioner:  "How many shots you got off?"

Mr. Leater:  "Four."

Petitioner:  "(laughter)"

[Petition, ex. E at 2.]

Pursuant to Mrs. Oldknow's interpretation, the jury received evidence indicating that another person who spent a substantial amount of time listening to the tape concluded that it was Mr. Leater who admitted to firing four shots.  Arguably, this interpretation of the exchange was more favorable to Petitioner.  The fact that Petitioner asked the question about the number of shots fired, however, could be construed to implicate Petitioner because it indicates Petitioner had knowledge of facts related to the crime.  Petitioner's attorney emphasized the differences between Detective Martin's and Ms. Oldknow's interpretations in his direct examination of Ms. Oldknow.  [R.T. 3249-50.]  Petitioner's attorney also extracted Mr. Duncan's acknowledgment that when he listened to the tape in the courtroom when it was played for the jury, he could not hear the statement, "The gun holds five."  [R.T. 3302.]

44

Dr. Shuy interpreted the exchange as follows:

Mr. Leater: "I ain't mean no disrespect, man, but you know I ain't sayin' nothin' till I talk to a lawyer."

Petitioner: "Yeah. They try, they tryin' to say, oh you shoot someone? Oh, uh, they, uh, you, uh, that's one thing I heard somebody say, uh, you know --"

Mr. Leater: "How many shots you got off? Four?"

Petitioner: "(laughs) They told five. They done took off my shoes, man. Caught somebody comin' back with the shoes. Every time my feet gonna need some shoes, man."

[Petition, ex. G at 3-4.]

Dr. Shuy's interpretation is not any more favorable to Petitioner than Ms. Oldknow's transcription. Although Dr. Shuy's version is not directly incriminating, it nonetheless implicates Petitioner because Mr. Leater's question infers that it was Petitioner who fired the shots at the victims.[13] Thus, Dr. Shuy's analysis of this particular

///

_____

[13]  In the Objections, Petitioner criticizes the Report and Recommendation for ignoring a more favorable interpretation of Dr. Shuy's transcript. [Objections at 13.]  Dr. Shuy's transcript also can be interpreted to indicate that Petitioner and Leater were discussing the police accusations, rather than their actual participation in the crimes. As discussed above, both Detective Martin and Ms. Oldknow's transcripts also can be interpreted in this manner, because they both contain reference to the statement, "they trying to say...." Although Dr. Shuy's transcript contains additional language to support this interpretation, it is not possible to conclude that providing this additional language to the jury probably would have resulted in a different verdict.

exchange does not add any significant value to the information the jury received via Ms. Oldknow's testimony.

At trial, Petitioner's attorney also emphasized inconsistent interpretations of an exchange concerning the gun used during the crimes.  In the final transcript, Detective Martin interpreted the exchange as follows:

Petitioner:  "They got some bullshit."

Mr. Leater:  "Man, they ain't got the guns.  If they had guns, man, we'd be booked, you understand what I'm saying?"

Petitioner:  "It's just like that bullshit with Hawthorne. Nothing.  Nothing at all man."

[Petition, ex. A at 2.]

This exchange incriminates both Petitioner and Mr. Leater, because it implies their joint knowledge that if the murder weapons were found, they would both be implicated.  On cross-examination, Detective Martin admitted that he earlier thought it was Petitioner who said, "If they had the guns, man, we'd be dead."  [R.T. 3073-74.] This earlier interpretation is even more inculpatory with respect to Petitioner, because it shows Petitioner's personal acknowledgment that the guns were a key piece of evidence.

Ms. Oldknow transcribed the exchange as follows:

Petitioner (?):  "They got some bullshit."

Mr. Leater:  "(...)  If they had something on us, man, we'd be booked, you understand what I'm sayin'?"

Petitioner (?):  "It's just like the bullshit with Hawthorne. Nothin.  Nothin at all, man."

[Petition, ex. E at 2-3.]

Ms. Oldknow's interpretation of this passage is not incriminating at all.  Thus, the jury had a basis for interpreting the exchange in a manner more favorable to Petitioner.  Again, Petitioner's attorney emphasized the differences between the two interpretations in his direct examination of Ms. Oldknow.  [R.T. 3250-51.]  Furthermore, on cross-examination, Mr. Duncan admitted that when he listened to the tape during a break in the trial proceedings, he could not hear the statement, "Man, they ain't got the guns."  [R.T. 3303-05.]

Dr. Shuy interpreted the exchange as follows:

Mr. Leater:  "They got some bullshit."

Petitioner:  "If they have somebody's name, he would be dead, you understand?  You understand what I'm sayin'?  It's just like that bullshit with Hawthorne."

Mr. Leater:  "Um-hm."

Petitioner:  "Nothin'.  Nothin' at all, man."

[Petition, ex. G at 4.]

Dr. Shuy's interpretation is similar to the interpretation presented to the jury in Ms. Oldknow's transcript.  Overall, the transcript prepared by Dr. Shuy does not differ in any dramatic respect from the totality of the evidence presented to the jury. Although the jury might have accorded more weight to testimony by an

47

expert, it still would have evaluated the expert's testimony and transcript against the other evidence linking Petitioner to the crime: Petitioner's request that Ms. Mendoza page Mr. Leater with a "911" signal on the night the murders took place [R.T. 2848]; Petitioner's subsequent request that Ms. Mendoza page Mr. Leater and ask that he call Petitioner, "but not on that phone" [R.T. 2862-63]; the presence of dog hairs in the victims' car that were "similar in appearance" to hairs removed from Petitioner's dog [R.T. 2797-98]; Ms. Mendoza's testimony that the denim jacket covering Mr. Yemsvat's head appeared to be one she had seen Petitioner wearing [R.T. 2865-66, 2881];[14] the demonstration of the jacket on Petitioner, which, according to the prosecutor, fit Petitioner "perfectly" [R.T. 3401]; and the placement of the telephone call to Edna Tavares at 2:00 a.m. on the morning of the murders.  [R.T. 3119, 3168-69.]  Although this additional evidence was circumstantial, the combined effect of these facts pointed toward Petitioner's guilt.  It is not reasonably probable that the presentation of expert testimony concerning the content of the tape,

///

---

[14]  In the Objections, Petitioner contends that the Report and Recommendation ignores conflicting testimony by Ms. Mendoza about the jacket.  [Objections at 14.]  In the summary of the facts presented at trial, the original Report and Recommendation Court described in detail the equivocal testimony by Ms. Mendoza about the jacket.  See supra at 4-5.  Petitioner also states that Ms. Mendoza "ultimately retracted her identification of the crime scene jacket as Petitioner's."  [Objections at 15.]  As summarized above in the text, Ms. Mendoza's testimony about the jacket was substantially weakened on cross-examination.  She did not, however, retract her identification.  On redirect, she affirmed that she believed the jacket belonged to Petitioner.  [R.T. 2881.]

which would have mirrored evidence already presented to the jury, would have caused the jury to reach a different verdict.[15]

A thorough examination of Dr. Shuy's declaration and transcript in the context of the record presented to the jury shows that the defense attorney's failure to present expert testimony concerning the content of the tape recording does not undermine confidence in the outcome of Petitioner's trial. Cf. Baylor v. Estelle, 94 F.3d 1321, 1324-25 (9th Cir. 1996), cert. denied, 117 S. Ct. 1329 (1997)(holding that an attorney's failure to follow up on evidence that a semen sample taken from a victim did not match the petitioner undermined confidence in the outcome, even though the petitioner had confessed to the crime and the confession was corroborated by the victim's version of the attack); Sims v. Livesay, 970 F.2d 1575, 1580-81 (6th Cir. 1992)(holding that an attorney's failure to present expert testimony analyzing the bullet holes and powder patterns on a quilt held by the murder victim amounted to ineffective assistance of counsel). The California Court of Appeal reached the same conclusion. [Return, ex. D at 309-11.] Petitioner does not show the Court of Appeal's conclusion was contrary to, or involved an unreasonable application

---

[15] In the Objections, Petitioner criticizes the Report and Recommendation for failing to address another exchange that was interpreted differently by Detective Martin and Dr. Shuy. [Objections at 13-14]. As noted by Petitioner, Dr. Shuy's interpretation of this additional exchange bolsters the conclusion that Petitioner and Leater were discussing the police accusations, not their actual conduct. Viewed against the entire record, however, it is not reasonably probable that the jury would have reached a different result if provided with Dr. Shuy's transcript.

49

of, clearly established federal law, or that it was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d). Accordingly, this claim should be denied.

### 3.  Presentation of Evidence of Phina Mendoza's Involvement in the Crime

In claim five, Petitioner asserts that his trial attorney rendered ineffective assistance of counsel because he failed to introduce evidence linking Phina Mendoza to the crimes.  Petitioner first explains that his attorney erred by failing to cross-examine Ms. Mendoza about her testimony at a Los Angeles Police Department Board of Rights hearing.[16]  At the hearing, Ms. Mendoza testified that between October 1990 and January 1991, she was present with Mr. Leater when he committed one grand theft auto and fifteen to twenty armed robberies.  [Petition, ex. I at 21, 23-24.][17]

During Petitioner's trial, Petitioner's attorney advised the court that he intended to cross-examine Ms. Mendoza about her internal affairs department testimony.  [R.T. 2840.]  The attorney explained that Ms. Mendoza's testimony was relevant because it inferred that she

---

[16]  The hearing involved an investigation of a police officer who knew Mr. Leater.  [Petition, ex. I at 18-19.]

[17]  In the Objections, Petitioner states that Ms. Mendoza testified that she was "involved in" the other crimes with Leater.  [Objections at 27.]  Ms. Mendoza's testimony, however, was extremely vague concerning the extent of her involvement.  At most, she admitted to observing Leater commit the crimes.

might have been an accomplice to the robbery and murder of Mr. Yemsvat and Mrs. Seaeow. [R.T. 2841.] The prosecutor stated that if defense counsel questioned Ms. Mendoza about the robberies, the prosecutor would ask Ms. Mendoza whether Petitioner also was present during any of the crimes committed by Mr. Leater. [R.T. 2840.] The prosecutor and Petitioner's attorney both indicated they did not know the answer to this question. [R.T. 2840-41.] Petitioner's attorney stated that he would speak to Ms. Mendoza about it before deciding whether to cross-examine her in this area. [R.T. 2841.]

Prior to his cross-examination, Petitioner's attorney informed the court that he had had an opportunity to speak to Ms. Mendoza. [R.T. 2856.] The attorney decided that cross-examining Ms. Mendoza about her internal affairs testimony would not be "the smart thing to do." [R.T. 2856.]

In support of his claim, Petitioner presents Ms. Mendoza's post-trial declaration, in which she states she does not recall Petitioner's attorney questioning her about her internal affairs testimony or the robberies she observed Mr. Leater commit. [Petition, ex. J at 1.] Ms. Mendoza states that she would have told Petitioner's attorney that Petitioner was not present during any of the robberies she observed. [Petition, ex. J at 2.]

Ms. Mendoza's statement that Petitioner's attorney did not ask her about her internal affairs testimony is at odds with the record. Petitioner's attorney voiced his intent to speak to Ms. Mendoza about

51

the robberies she committed with Mr. Leater, and subsequently informed the court that he had talked to her. These comments indicate that Petitioner's attorney did, in fact, speak to Ms. Mendoza about her internal affairs testimony.

The record also indicates that Petitioner's attorney decided it would not be "smart" to question Ms. Mendoza in this area. This statement indicates the attorney made a strategic decision not to question Ms. Mendoza about the robberies. This decision was reasonable. The fact that Ms. Mendoza observed Mr. Leater commit other crimes would have provided only a weak inference that she was present during the Yemsvat-Seaeow murders, and would not have ruled out Petitioner's participation in the murders. Furthermore, in view of the evidence clearly linking Mr. Leater to the murders, as well as the evidence of Petitioner's friendship with Mr. Leater, Ms. Mendoza's testimony about Mr. Leater's other criminal activities might have caused the jury to find Petitioner guilty by association with Mr. Leater, an avenue that Petitioner's attorney would not have wanted to pursue.

Petitioner does not show his attorney was incompetent in failing to question Ms. Mendoza about her internal affairs testimony. Moreover, due to the weak evidentiary value of this information, Petitioner does not show that if his attorney had cross-examined Ms. Mendoza in this area, the result of the trial would have been different. Thus, this claim fails under both prongs of the Strickland test.

Petitioner also contends his attorney erred because he:  (a) failed to establish that Ms. Mendoza and Mr. Leater broke off their relationship two days after the murders; (b) failed to establish that Ms. Mendoza previously worked for an automobile insurance company; and (c) failed to establish that Ms. Mendoza was an habitual gum chewer. Petitioner explains that the evidence of Ms. Mendoza's failed relationship would have undermined her credibility by introducing a motive for her to lie.  Ms. Mendoza's employment by an insurance company would have been relevant because Mr. Yemsvat and Mrs. Seaeow owned an insurance company.  [R.T. 2957, 2985.]  The evidence of Ms. Mendoza's gum chewing habit would have been relevant because gum packages were found in the garage near the victims' car, and on a desk in the victims' apartment.  [R.T. 2636, 2672.]

These facts would have provided no more than a bare inference that Ms. Mendoza was involved in the crime.  In particular, the fact that Ms. Mendoza chewed gum would not have been persuasive, since a package of gum also was found in the leather jacket worn by Mr. Yemsvat.  [R.T. 2665, 2673-74.]  It would have been unlikely that Ms. Mendoza would have placed a package of gum in Mr. Yemsvat's jacket pocket.  Furthermore, even if the facts as a whole raised an inference that Ms. Mendoza might have been involved in the murders, they would not have ruled out Petitioner' participation in the murders. Therefore, Petitioner does not show his attorney erred in failing to raise these facts, or that the result of the trial would have been different if these facts had been explored.

///

53

The California Court of Appeal concluded that Petitioner's trial attorney did not render ineffective assistance of counsel by failing to link Ms. Mendoza to the murders.   [Return, ex. D at 313-15.] Petitioner does not show the Court of Appeal's conclusion was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  Accordingly, this claim should be denied.

## V.     RECOMMENDATION

For all of the foregoing reasons, the Magistrate Judge recommends the Court issue an Order:  (1) approving and adopting this Amended and Final Report and Recommendation; and (2) and directing that judgment be entered denying the Petition with prejudice.

DATED: February 25, 1999

_____
VIRGINIA A. PHILLIPS
UNITED STATES MAGISTRATE JUDGE

54